ERIC JONES and HERBERT BOWENS,

   Plaintiffs,

            Case No. 22-cv-364-pp

 v.

PROGRESSIVE UNIVERSAL INSURANCE COMPANY
and ARTISAN AND TRUCKERS CASUALTY COMPANY,

   Defendants.

---

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE REPORT AND TESTIMONY OF KIRK FELIX (DKT. NO. 46), DENYING DEFENDANTS' MOTION TO EXCLUDE REPORT AND TESTIMONY OF JEFFREY MARTIN (DKT. NO. 49), DENYING DEFENDANTS' MOTION TO EXCLUDE REPORT AND TESTIMONY OF JASON MERRITT (DKT. NO. 53), GRANTING DEFENDANTS' UNOPPOSED MOTION FOR ORAL ARGUMENT ON CLASS CERTIFICATION AND SUMMARY JUDGMENT (DKT. NO. 101) AND SETTING MOTION HEARING**

---

   The plaintiffs filed this case as a class action challenging how Progressive Universal Insurance Company values it's insured's vehicles after a total loss. The plaintiffs argue that Progressive improperly relies on valuation reports prepared by Mitchell International, Inc. to determine the "actual cash value" (ACV) of a car by applying a "projected sold adjustment" (PSA). Dkt. No. 1 at ¶1. The plaintiffs amended their complaint to add Artisan and Truckers Casualty Company, alleging that both defendants use the Mitchell reports. Dkt. No. 19. The defendants claim that they would be overvaluing vehicles if they relied only on the advertised price of comparable vehicles. They argue that the

Case 2:22-cv-00364-PP   Filed 03/25/24   Page 1 of 26   Document 112

ACV depends on a number of variables unique to each vehicle. Dkt. No. 34 at 3.

The defendants filed motions challenging three of the experts relied on by the plaintiffs in connection with their pending class certification motion. Dkt. Nos. 46, 49, 53. They since have filed a motion for summary judgment, dkt. no. 91, which was fully briefed as of March 22, 2024, dkt. no. 107, and an unopposed motion for oral argument on class certification and summary judgment, dkt. no. 101. There also are two pending motions to restrict, which the court will address in a separate order. Dkt. Nos. 108, 110.

The court will grant in part the motion to exclude the testimony of Kirk Felix and deny the motions to exclude the testimony of Jeffrey Martin and Jason Merritt. The court will grant the defendants' unopposed motion for oral argument on class certification and summary judgment. Dkt. No. 101.

## I. Motions to Exclude (Dkt. Nos. 46, 49, 53)

Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) govern the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert by knowledge, skill, experience, training or education. Fed. R. Evid. 702. The party seeking to introduce the testimony must establish that it is more likely than not that the testimony (specifically, the proposed expert's knowledge) will assist the trier of fact to understand the evidence or to determine a fact at issue, that the testimony is based on sufficient facts or data, that the testimony is the product of reliable principles and methods and that the expert's opinion

2

reflects a reliable application of the principles and methods to the facts of the case. Rule 702. The court acts as a gatekeeper to ensure that the testimony rests on a reliable foundation and is relevant to the task at hand. Kirk v. Clark Equip. Co., 991 F.3d 865, 872 (7th Cir. 2021) (quoting Daubert, 509 U.S. at 589).

Under Rule 702 and Daubert, the court engages in a three-step inquiry before admitting testimony. Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017)). The court considers (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. Id.

The court first considers the expert's qualifications. An expert need not have particular academic credentials to be qualified; "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000). "The question [the court] must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" Gayton v. McCoy, 593 F.3d 610, 617 (7th Cir. 2010) (quoting Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994)). The court looks at each of the expert's conclusions individually "to see if he has the adequate education, skill, and training to reach them." Id.

"A court's determination that an expert possesses the requisite qualifications does not, without more, provide a sufficient basis for

3

admissibility." Kirk, 991 F.3d at 873. The court must also find the opinion to be reliable and relevant. In assessing the reliability, courts may consider the following non-exhaustive factors:

(1)     Whether the particular scientific theory can be (and has been) tested;
(2)     whether the theory has been subjected to peer review and publication;
(3)     the known or potential rate of error;
(4)     the existence and maintenance of standards controlling the technique's operation; and
(5)     whether the technique has achieved general acceptance in the relevant scientific or expert community.

Kirk, 991 F.3d at 873 (quoting Deputy v. Lehman Bros., Inc., 345 F.3d 494, 505 (7th Cir. 2003)) (internal brackets and quotation marks omitted); see also Gopalratnam, 877 F.3d at 779-80 (discussing additional factors outlined in the Notes of Advisory Committee on Rules to the 2000 Amendment of Rule 702).

Finally, the court considers whether the proposed expert testimony will assist the trier of fact in determining a fact in issue or understanding the evidence. Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002).

A.     Defendants' Motion to Exclude the Report and Testimony of Kirk Felix (Dkt. No. 46)

1.     *Parties' Briefs*

The defendants argue that the plaintiffs' expert, Kirk Felix, did not review any data, research, materials or other information to formulate his opinions; he relied on the materials provided by plaintiffs' counsel. Dkt. No. 47 at 3, 9. The defendants assert that Felix lacks sufficient knowledge to testify about how "all dealers operate nationwide." Id. at 12. The defendants say that Felix has no actual knowledge as to how Mitchell's valuation process works or how Mitchell

4

analyzes the data to calculate the PSA. Id. at 14. They argue that his opinion will be unhelpful to the trier of fact because the central issue is whether Progressive underpaid the plaintiffs and, if so, by how much. Id. at 3.

The plaintiffs' response is twofold: (1) Felix is qualified because he has "decades of experience in consulting in the used car industry," dkt. no. 68-1 at 2; and (2) the Daubert motion is premature because the experts' opinions aren't relevant to whether the plaintiffs have satisfied the Rule 23 requirements, id. at 8. According to the plaintiffs, Felix will focus on how used cars are priced in today's auto industry and whether list prices reflect cash market price. Id. at 8. The plaintiffs also assert that the defendants filed the Daubert motions too soon: the plaintiffs are waiting for the "merits deadlines" to move to exclude the defendants' experts. Id. at 7. They assert that any ruling at this stage should be limited to whether the opinions are admissible on the class certification issues. Id. Regardless, the plaintiffs believe that "experts are not required to consider all facts in a case when forming their opinions." Id. at 12 (citing Reed v. Tracker Marine LLC, 574 F. Supp. 3d 1065, 1078 (N.D. Ala. 2021)). And they argue that Felix will provide the jury with the relevant context for assessing the data and determining whether the defendants' valuation finds "support in the realities of the modern market." Id. at 15.

The defendants reply that the plaintiffs cite to Felix's report throughout the class certification briefing (and even attached it as an exhibit). Dkt. No. 73 at 2. They reiterate that Felix has not relied on any facts, data or methodology that can provide support for his opinions, and assert that even nonscientific

5

opinions are subject to <u>Daubert</u>. <u>Id.</u> They maintain that the jury can do the same thing that Felix did (read the reports, listen to arguments and decide within their own experience whether the data "comports with the realities of the modern used-auto market"). <u>Id.</u> at 3. Finally, the defendants ask the court to exclude Felix's "unwarranted extrapolations about the Mitchell valuation methodology and the PSA." <u>Id.</u>

        2.    *Analysis*

Before applying Rule 702 and <u>Daubert</u>, the court briefly address the plaintiffs' argument that the motion is premature. A full <u>Daubert</u> analysis is warranted where the opinions are critical to the court's ruling. <u>See</u> <u>Messner v. Northshore Univ. HealthSystem</u>, 669 F.3d 802, 812-23 (7th Cir. 2012). Not only are Felix's opinions referenced in the plaintiffs' certification motion, but the parties have moved beyond certification to the merits stage. They currently are briefing the defendants' summary judgment motion. There is no reason to delay ruling on the requests to exclude these experts.

        a.    Qualifications

Felix received his Bachelor of Science degree in Business from the University of Colorado, Denver, in 1986. Dkt. No. 48-3 at 3. Since graduation, he has worked for forty-one years in the automotive industry. He has worked as a district service manager at American Honda Motor Company, Inc. in California (July 1986 to June 1991), a Service Director for two dealerships in California (June 1991 to March 1998), a Fixed Operations Director at a dealership in Georgia (March 1998 to July 1999), an Automotive Executive

6

Moderator/Consultant with NCM Associates in Missouri (July 1999 to September 2022), and an Automotive Dealership Buy/Sell Broker (January 1, 2023 to the present). While working in fixed operations, Felix was responsible for the daily operation of the service and parts departments and focused on overall dealership volume and profitability. Dkt. No. 48-2 at 2. At NCM Associates, Felix ran "20 Groups, which are groups of 20 dealerships from around the country that do not directly compete with each other." Id. They met at "regular intervals to discuss industry trends and best practices for operating efficient, profitable dealerships." Id. According to Felix, he worked with more than 300 dealerships over the years and a recurring theme was "adapting to changes in the industry brought about by the internet." Id. at 3. He explains:

> Inside dealerships, the internet has changed the pricing practices by enabling dealers to have access to constantly updated market data, such as through pricing and inventory management tools like V-Auto. Dealers throughout the nation adopted these tools to be able to accurately determine the market price for a vehicle they were taking into inventory and, working backward from that price, determining a price at which they could purchase the vehicle and recondition it for retail sale. On the consumer side, the internet provides a much more transparent market where consumers can easily compare vehicles across competitors. Dealers expect consumers to make those comparisons and have to price their inventory accordingly if they are going to turn it. Based on my experience, pricing to market is the norm in the modern used car industry.

Id. at 3.

The plaintiffs bear the burden of showing that this background qualifies Felix to opine about the specific subject matter of his testimony. Felix intends to offer the following opinions: (1) the internet has changed the traditional car buying process and the "price IS the price"; (2) Mitchell uses the same process

7

as used car dealers, except for the projected sold adjustment, and the application of the PSA deduction is "directly contrary to reality in the used auto market"; (3) the reasons that dealers may make adjustments in pricing; (4) the reasons a vehicle may sell for more than the listed price; (5) in the used car industry, the listed price reflects the market price; and (6) COVID-19 impacted the price of vehicles, but not pricing practices.

The court finds that Felix has the knowledge and experience to testify about most these topics. He has the knowledge and experience to testify about general market trends and the reasons that dealers may adjust their prices up and down. He is qualified to talk about changes brought on by the internet, the fact that the list price equals the market price in the used car industry and the fact that COVID-19 did not impact pricing practices. Felix represents that he has served as a moderator on these topics and worked with over three hundred dealerships in forty-five states.

The court questions only whether Felix is qualified to testify about Mitchell's valuation process or methodology. At his deposition, Felix testified that he is not planning to provide an opinion about the statistical validity of the PSA, whether Mitchell is an appropriate source for determining actual cash value or whether the plaintiffs were injured. Dkt. No. 48-1 at 12, Tr. p. 39, lines 3-21. In his report, he opines that the Mitchell valuation process "is directly contrary to reality in the used auto market." Dkt. No. 48-2 at 7. He explains that:

> Progressive is essentially using the same method and same sources to value vehicles as car dealers use to price vehicles.

8

Mitchell and Progressive assume that car dealers go through that process, identify a market price, and then advertise the vehicles above that market price on the off chance of finding someone willing to pay more than the market price but willing (and expecting) to negotiate down. For the reasons I already explained, that just is not true.

Id. Felix admits that he makes his assumptions about the Mitchell valuation process from talking with the plaintiffs' counsel. Id. at 6, 7 ("I understand from talking to counsel . . ." and "My understanding based on conversations with counsel . . ."). He further admits that he has no familiarity with Mitchell's valuation product or the underlying data:

> Q:   So aside from this case, are you familiar with Mitchell's WorkCenter Total Loss product?
> A:   No, I'm not.

Dkt. No. 48-1 at 8, Tr. p. 22, lines 1-3.

> Q:   Have you ever personally used the Mitchell WorkCenter Total Loss Software?
> A:   No I haven't.

Id. at lines 16-18.

> Q:   Have you done any expert work relating to Mitchell other than for cases filed by plaintiffs' counsel against Progressive?
> A:   No, I have not.

Id. at 9, Tr. p. 27, lines 20-23.

> Q:   So that sentence: My understanding is that in calculating the projected sold adjustment, Progressive considers transactions where a vehicle sells for less than the listed price but does not consider transactions where the vehicle sells for more than the listed price. Where did that understanding come from?
> A:   Just in discussions with the attorneys.
> Q:   Did you do anything to verify that?
> A:   No, I did not.
> Q:   Did you review any information from Mitchell about how it calculates projected sold adjustment?

9

> A:　No, I didn't. Actually, I have been exposed to some data, but it turned out that that was data from Autotech and not from Mitchell.
>
> Q:　So you have not seen any data regarding Mitchell's projected sold adjustment?
>
> A:　I have not.

Id. at 15, Tr. p. 50, lines 23-25; 51, lines 1-16.

Felix's experience lays the foundation for testimony about how vehicles are priced in the auto industry and what factors may affect whether a vehicle sells for more or less than the list price. He is qualified to testify that the *concept* of a PSA is inconsistent with a modern used car market based on his experience. But the plaintiff has not demonstrated by a preponderance of the evidence that Felix has the expertise or knowledge to opine about Mitchell's methodology because he admits that he is not familiar with it and has not reviewed it. See Costello v. Mountain Laurel Assurance Co., Case No. 22-CV-35, 2024 WL 239849, at *11 (E.D. Tenn. Jan. 22, 2024) ("However, Felix has admitted that he does not have sufficient knowledge regarding Mitchell's process and underlying data to form an opinion as to the method's reliability. . . . Accordingly, for clarity of the record, the Court specifically finds that Felix is prohibited from providing testimony directly addressing Mitchell's methodology.") (bracketed information omitted).

### b.　Reliability

Felix's expertise is not based on science, but on knowledge, skill, and training. The Supreme Court recognizes that "there are many different kinds of experts, and many different kinds of expertise." Kumho Tire v. Carmichael, 526 U.S. 137, 50 (1999). The test of reliability, therefore, "is 'flexible,' and Daubert's

10

list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id. at 141 (quoting Daubert, 509 U.S. at 594. In the end, "the gatekeeping inquiry must be 'tied to the facts' of a particular 'case,'" Kumho Tire, 526 U.S. at 150, and "the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors," Lees v. Carthage College, 714 F.3d 516, 521.

In December 2023, Rule 702(d) was amended "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Skaggs v. Ferrellgas, Inc., Case No. 21-cv-02406, 2023 WL 8711898, at *3 (S.D. Ind. Dec. 18, 2023). "An expert who is addressing non-scientific issues must still employ reliable methods and principles in forming their opinions . . . ." Id.

As mentioned above, Felix has forty-one years of experience in the automobile industry. This experience includes moderating and consulting with dealerships from around the country about industry trends and best practices for operating efficient, profitable dealerships. Dkt. No. 48-2 at 2. During his deposition, Felix explained that when he was with NCM, he was holding over thirty-plus meetings a year, dkt. no. 48-1 at 11, Tr. p. 36, lines 10-14, and that a recurring topic was adapting to changes in the industry brought about by the internet, and more specifically pricing and inventory tools like V-Auto, dkt. no. 48-2 at 3. He testified that he is relying on that experience. Dkt. No. 48-1 at 9, Tr. p. 28, lines 21-25. Felix also explained that his experience has provided him "with a vast amount of knowledge as far as how the auto business works

11

in the US and what's happened with used car pricing over the last at least a decade as far as the way that the used car pricing has changed because of the impact of the internet." <u>Id.</u>, Tr. p. 29, lines 3-8. He added that NCM took four-to-six page financial statements from the dealerships and produced "35-plus pages of financial comparisons with thousands of metrics to review with each dealership." <u>Id.</u>, lines 19-25.

The court finds that Felix's opinions about how vehicles are priced in the auto industry, what factors may affect whether a vehicle sells for more or less than the list price, general market trends and the reasons that dealers may adjust their prices up and down, changes brought on by the internet, the fact that the list price equals the market price in the used car industry and the fact that COVID-19 did not impact pricing practices—even his opinion that the *concept* of a PSA is inconsistent with a modern used car market—reflect a reliable application of his principles and methods—really, the knowledge he has gained over his years in the industry, playing the roles he has played—to the facts of the case.

c.     Relevance

The defendants argue that Felix's testimony is not relevant to the valuation of the plaintiffs' cars in this case and would not be helpful to the jurors, who can rely on their own experiences. The court disagrees. Felix's report details the history of pricing and selling of vehicles in the used auto market, noting a shift from "costs up" pricing and selling practices to the current, data-driven market. Dkt. No. 48-2 at 4. He also explains various

12

reasons a vehicle might sell for less or more than its listed price. Id. at 4-6, 7-12. This testimony provides relevant benchmarks for the court and jurors to use in comparing what happened in this case with the used-car industry's current practices. The court is not persuaded by the defendants' argument that the average layperson would possess such knowledge.

The court will deny the motion to exclude Felix's testimony, but will prohibit the plaintiffs from eliciting from Felix testimony about Mitchell's valuation process or methodology. The court will prohibit the plaintiffs from relying on any testimony or opinions Felix has provided about Mitchell's valuation process or methodology in its briefing, and the court will not rely on his opinions in that regard to the extent that they have been included in briefs already filed.

B.    Defendants' Motion to exclude the Report and Testimony of Jeffrey Martin (Dkt. No. 49)

1.    *Parties' Briefs*

The defendants move to exclude Jeffrey Martin as an expert. Initially, the defendants argue that the plaintiffs never properly disclosed Martin as an expert witness. Dkt. No. 50 at 3. They also argue that the entirety of Martin's report depends on a "purported analysis of a data set that Plaintiffs' counsel purchased from a company called Cross-Sell," and assert that Martin made no efforts to understand or verify the Cross-Sell data. Id. at 3. According to the defendants, Martin learned at his deposition that the Cross-Sell data does not represent the sales price of any given used car but rather the taxable value of the transaction (including add-ons such as fees, warranties, service contracts

13

and accessories). Id. at 3, 9. The defendants argue that Martin did nothing to determine whether the Cross-Sell data from Texas, Virginia and Ohio is statistically representative of any other state. Id. at 15, 17. They point out that the plaintiffs' motion for class certification relies heavily on Martin's opinions and that his opinion is the only evidence that plaintiffs cite to support their assertion that "list price equates to market value and, thus, the PSA deduction is invalid." Id. at 13. The defendants accuse Martin of being "little more than a self-described 'calculator'" for the plaintiffs' attorneys. Id. at 16. The defendants believe Martin's testimony is largely unhelpful and probably will be confusing to the jury. Id. at 17.

The plaintiffs clarify that there are two data sets of "sold" and "list" data involved in the litigation: (1)the Cross-Sell market data from every single transaction from every single dealership in three states; and (2) the defendants' data derived "from an unknown number of dealers representing an unknown portion of the market." Dkt. No. 66-1 at 2. They say that Martin received the list data from one vendor, MarketCheck, and the sold data from Cross-Sell. Id. The plaintiffs explain that after using VINs to match vehicles from the sold data, Martin's analysis showed that the median sold-to-list ratio ("S/L Ratio") is 1.0 across all three states (the mean is either 1.0 or a *de minimis* amount). Id. at 2, 3. The plaintiffs say that in contrast, JD Power (who creates the Mitchell valuation) excluded and deleted any records of transactions where the sold price matched the list price prior to July 2021 and always deleted the records where the sold price exceeded the list price. Dkt. No. 43-7. The plaintiffs assert

14

that the defendants are wrong about the Cross-Sell data because Texas and Virginia did not include "add-ons" in their data. Id. at 5, 13, 14. The plaintiffs acknowledge that Ohio includes documentary fees of $250 in their data, but claim that this is immaterial because Martin recalculated (deducting the fees from each sale) and it had little effect on the S/L Ratio (the mean S/L was 1.014). Id. at 16.

In reply, the defendants continue to assert that Martin has no real idea what the Cross-Sell data contains. Dkt. No. 75 at 4. They point out that Martin testified that he did not know whether the sold price figures included any number of additional items that a state may require the dealership to report. Id. at 6 (citing Dkt. No. 51-3 at 26, Tr. p. 95, lines 23-25; 96, lines 2-4) (Q: "So you don't know what precisely is included in any of the Cross-Sell data that you used; is that right?" A: "Precisely, I didn't . . . I didn't verify this data"). Id. at 7. The defendants suggest that the plaintiffs easily could have cleared up any confusion by asking Cross-Sell, "[i]ndeed, it is reasonable to conclude that for the nearly $20,000 it was paid, Cross-Sell itself would clear the issue up for Plaintiffs. Yet it has not." Id. at 8. The defendants also take issue with the plaintiffs' suggestion that Virginia and Texas don't include ancillary transactions. Id. at 8-9.

### 2. *Analysis*

On page 3 of their motion to excluded Martin, in the introduction section, the defendants state, "Plaintiffs never properly disclosed Martin as an expert witness in this case." Dkt. No. 50 at 3. In a footnote to that sentence, the

defendants assert, "Plaintiffs have made no attempt to demonstrate justification or harmlessness—indeed, they have not even amended their disclosures to include Martin." Id. at 3 n.1.

"Rule 26(a)(2) of the Federal Rules of Civil Procedure requires the proponent of expert testimony to disclose the witness's identity, along with a written report that contains, among other things, a 'complete statement of all opinions the witness will express and the basis and reasons for them.'" Happel v. Walmart Stores, Inc., 602 F.3d 820, 825 (7th Cir. 2010). "The sanction for failure to comply with this rule is the 'automatic and mandatory' exclusion from trial of the omitted evidence, 'unless non-disclosure was justified or harmless.'" Id. (quoting Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 869 (7th Cir. 2005)).

The entirety of the defendants' argument regarding the plaintiffs' failure to disclose Martin consists of the single sentence on page 3 of their brief, in which they assert that the plaintiffs did not disclose Martin (Dkt. No. 50 at 3 and n.1). The defendants have not mentioned sanctions or asked the court to impose sanctions. On the other hand, the plaintiffs did not respond to the defendants' argument that they failed to disclose Martin, and the plaintiffs' Rule 26 expert disclosures, provided by the defendants (Dkt. No. 51-2) do not list Martin. Seventh Circuit law makes a sanction "automatic and mandatory" unless the nondisclosure was substantially justified or harmless, and the plaintiffs have not argued substantial justification, harmlessness or anything else.

16

This case is not the only suit in the country involving this issue, these attorneys or these experts. The defendants have filed similar motions to exclude Martin's testimony in other cases pending before other courts. See Freeman v. Progressive Direct Ins. Co., Case No. 21-cv-3798 (D. S.C.), Dkt. No. 59; Brown v. Progressive Mountain Insurance Co., Case No. 21-cv-175, 2023 WL 9193005, *4, *6 (N.D. Ga. Sept. 20, 2023) (denying defendants' motion to exclude Martin and denying in part defendants' motion to exclude Felix); Drummond v. Progressive Specialty Ins. Co., Case No. 21-4479, 2023 WL 5181596, *5, *7 (E.D. Pa. Aug. 11, 2023) (denying defendants' motion to exclude Martin, Merritt, and Felix).

Although the plaintiffs have not argued that the nondisclosure was harmless, the timeline of this and similar litigation makes it almost impossible for the court to conclude that the plaintiffs' failure to disclose Martin has harmed the defendants. The plaintiffs made their Rule 26 disclosures in this case on April 14, 2023; by that time the defendants' attorneys had deposed Martin in the Drummond and Freeman cases (same attorneys) on October 19, 2022 and January 9, 2023, dkt. nos. 51-3, 51-4, and in the Brown and Costello cases, dkt. nos. 51-5, 51-8. By June 1, 2023, the defendants had deposed Martin in this case. Dkt. No. 51-6. In his report, Martin explains that the report in this case "mirrors the Reports [he] provided in Freeman v. Progressive, Driggins v. Progressive and Brown v. Progressive, three cases [he] understand[s] to involve materially identical claims, and addresses the same data." Dkt. No. 51-1 at ¶7.

If the defendants could demonstrate that the nondisclosure harmed them, presumably that argument would have featured prominently in their brief. They would have included more than a single sentence in the body of the brief and a footnote. Prior to the date on which the plaintiffs made their Rule 26 disclosures, the defendants knew of Martin and had deposed him on more than one occasion. They deposed him in this case shortly after receiving the plaintiffs' Rule 26 disclosures (which shows that they were aware that the plaintiffs intended to rely on his expert opinions), and the defendants have filed (and lost) <u>Daubert</u> motions to exclude Martin in other courts. On this record, the court will not exclude Martin solely on the basis that the plaintiffs failed to include his name on their list of proposed experts in their Rule 26 disclosure.

a.    Qualifications

Martin is qualified as a statistician and data analyst. He graduated with a bachelor's degree in Mathematics and Economics from Vanderbilt University and a master's degree in Economics from the University of Chicago. Dkt. No. 51-1 at 2. He has worked as a consultant on statistical issues, actuarial issues and on political campaigns. <u>Id.</u> at 2, 18. His academic research and current work focuses on the use of computers and statistical procedures to analyze data. <u>Id.</u> at 2. He has extensive experience working as a consultant on jury pools and statistical issues. <u>Id.</u> at 18. Martin has provided a list of cases in which has provided testimony, including the <u>Drummond</u>, <u>Freeman</u> and <u>Brown</u> cases filed against Progressive. <u>Id.</u> at 22. The court finds that Martin is qualified as an expert statistician.

18

b.     Reliability

Unlike Felix, whose expertise and opinions are based on his experience, Martin's opinions are based on methodology, and he provided the methodology he used in formulating his opinion. Martin explains that he used the list and sold data from two vendors and identified matches based on the specific VIN number. Dkt. No. 51-1 at ¶¶9-18. He received the list data from MarketCheck and the sold data from Cross-Sell, for used cars in the states of Texas, Virginia and Ohio from 2018 through 2021. Id. at ¶¶15, 16. As part of calculating the median and mean S/L Ratio, he identified outlier parameters using two statistically acceptable formulas. Id. at ¶¶19-21. For each of the relevant years, Martin identified the total number of matches in aggregate and by specific state and identified both the median and mean S/L Ratio. Id. at ¶¶25-52. The median S/L Ratio in the aggregate and in each individual state was always 1.0. Id. at ¶¶27-28, 30-31, 34-35, 37-38, 41-42, 44-45, 48-49, 51-52, 58.

The parties argue over the accuracy of the Cross-Sell information, but Martin avers that the data—received from the DMV—is used "for research and analysis and projects in a variety of industries, including universities, insurance companies, appraisal companies and the auto industry." Dkt. No. 51-1 at ¶16. Specifically, the parties are at odds about whether the Cross-Sell data includes ancillary costs and fees but that is an issue to be explored on cross-examination, not an issue of whether Martin's opinion reflects a reliable application of his principles and methodology to the facts of the case. The defendants have not persuaded the court that Martin's opinions do not reflect a

19

reliable application of his principles and methods to the facts. Martin's opinion satisfies the reliability requirement under Daubert.

              c.       Relevance

Martin's testimony will be helpful to the trier of fact because his testimony regarding the sold-to-list ratio is relevant to the plaintiffs' argument that it is common to sell used vehicles for the list price. His statistics and data analysis are consistent with Felix's experience-based opinions, providing additional insight into the national used car market. His opinions, supported by the statistics and data analysis, are consistent with the plaintiff's theory of the case. The court will deny the defendant's motion to exclude Martin's testimony.

      C.      <u>Defendants' Motion to Exclude the Report and Testimony of Jason Merritt</u> (Dkt. No. 53)

           1.     *Parties' Briefs*

The defendants' third motion to exclude focuses on the testimony of Jason Merritt, who opines that the PSA used in Mitchell's WorkCenter Total Loss Valuation (WCTL) valuation software is inconsistent with industry standards. Dkt. No. 54-1 at 3. The defendants argue that Merritt didn't apply any methodology, standards or principles but instead relied on "common sense" and "word-of-mouth." Id. at 3, 9. The defendants say that Merritt's approach is problematic because industry standards exist and Merritt could have relied upon them. Id. at 10. They say that in his opinion, Merritt suggests that "backing out" out the PSA in the Mitchell reports will result in an accurate ACV, but they assert that he never has used the WCTL software (which is used

20

to generate the reports) and that he has made incorrect assumptions regarding the underlying data. Id. at 3, 5. According to the defendants, the "uncontested evidence" established that the PSA cannot be "backed out" because other adjustments would be required if the report was generated without a PSA. Id. at 3, 6, 11-12. They suggest that Merritt didn't follow his own methodology, which, they argue, renders his opinion little more than conjecture. Id. at 3, 7-8, 14-15. Specifically, they contend that Merritt never attempted to determine the cash value of the plaintiffs' cars "using any methodology with which he is actually familiar." Id. at 12.

The plaintiffs respond that Merritt is qualified: he works as a professional personal-property appraiser and owns East Coast Auto Appraisers, LLC. Dkt. No. 43-21 at 1. Merritt is certified through the Bureau of Certified Appraisers and has appraised over a thousand vehicles. Id.; Dkt. No. 67 at 2, 5. The plaintiffs insist that Merritt can reliably offer testimony as to: (1) what an appraisal is; (2) how to use the comparable or "comp" methodology to appraise a vehicle's ACV; (3) Progressive's erroneous application of a PSA; and (4) the vehicle valuation report that Progressive provided to the plaintiffs, which he says can be used to determine the ACV of plaintiffs' vehicles by excising the PSA deduction. Dkt. No. 67 at 5-6. The plaintiffs point out that there are many sources of accepted standards of appraisal and valuation and that Merritt need not be certified by the Uniform Standards of Professional Appraisal Practice or the American Society of Appraisers to be qualified as an expert. Id. at 15. The plaintiffs insist that, as an appraisal expert, Merritt may review and rely on the

Mitchell reports. Id. at 20. The plaintiffs contend that the defendants'
arguments go to the weight, rather than the admissibility, of Merritt's
testimony. Id. at 19.

The defendants reply that the plaintiffs concede Merritt is unfamiliar
with widely accepted appraisal standards and do not dispute that he fails to
identify a single standard in his report. Dkt. No. 78 at 2, 4. They say that
Merritt never actually conducted an appraisal of the plaintiffs' vehicles at issue
in this case. Id. at 2. The defendants argue that Merritt has no knowledge
regarding WCTL software and did nothing to verify the accuracy of the
plaintiffs' WCTL reports. Id. The defendants argue that relying on experience is
not enough because the expert must explain how his experience leads to the
conclusion, why the experience forms a sufficient basis for the opinion and how
the experience is reliably applied to the facts. Id. at 4-5 (citing Holden Metal &
Aluminum Works, Ltd. v. Wismarq Corp., Case No. 00 C 0191, 2003 WL
1797844, at *2 (N.D. Ill. Apr. 3, 2003). They suggest that it is immaterial that
other appraisers have endorsed Merritt's methodology: the question is whether
there is any support for his conclusions regarding the "appraisal" standards
and PSA. Id. at 5. The defendants assert that "backing out" the PSA would not
work "because the PSA is one factor in determining comparable vehicle's
adjusted prices and any change would result in a change to the dollar amount
of the condition adjustment (and therefore market value). Dkt. No. 78-1 at 18-
19. The defendants argue that Merritt's testimony in a case in South Carolina
was different because in that case, he offered a concrete methodology, reviewed

22

several nationally recognized valuation guides and determined what the fair market value of the vehicle in scope is worth. Dkt. No. 78 at 9.

2. *Analysis*

a. Qualifications

Like Felix, Merritt relies on his experience to form his opinions. Merritt is a certified appraiser who has appraised over a thousand vehicles to determine their fair market value. Dkt. No. 43-21 at 1. With over forty years of experience, Merritt began his career by performing detailed vehicle safety inspections for the state of Maryland. While working for the Maryland State police for twenty-eight years, he acquired and maintained the unit's vehicles. Id. at 2. He worked for Timbrook Automotive and conducted hundreds of vehicle appraisals to determine the fair market value of the vehicles. Id. Merritt owns East Coast Auto Appraisers, LLC and is certified through the Bureau of Certified Auto Appraisers. Id. at 1. Included in his estimate of "over a thousand" appraisals are hundreds of appraisals involving the value of a totaled vehicle. Id. at 1-2.

Like other courts, this court finds Merritt qualified to testify about his experience in conducting appraisals, applying comp methodology and whether PSAs are typically applied. He also is qualified to testify that based on his review of the reports in this case, Progressive appears to deviate from the comp methodology by applying a PSA.

b. Reliability

Merritt's report discusses appraisal methods, such as using a comp methodology to determine the pre-loss actual cash value of a vehicle. Id. at 3-4.

23

He explains the comp methodology as used to determine the ACV and then explains that he finds the two vehicle valuation reports produced in this case to be consistent with the comp methodology. Id. at 4. He opines that, while generally acting consistently with the comp methodology, Mitchell deviates by applying a PSA deduction to the internet prices of the specific comparable vehicles advertised for sale. Id. Merritt explains that the application of the PSA is inconsistent with appraisal standards and the comp methodology. Id. at 6-7. He testifies that, absent the PSA deduction, the Mitchell methodology provides a sound determination of the ACV. Id. at 7-8.

Merritt relies entirely on his experience, which is permissible under Rule 702. He generally agrees with Mitchell's approach with the exception of the application of the PSA. Merritt suggests that one could "line-item out each Projected Sold Adjustment applied to a comp, recalculate the 'Adjusted Price' of each comparable vehicle to which a Projected Sold Adjustment was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised 'Base Value.'" Id. at 7-8. He walks through his calculations to explain how he reaches the market value of the vehicles at issue in this case. Id. at 8-9.

The defendants have not convinced the court that Merritt's opinions do not reflect a reliable application of his principles and methods—his experience with comp methodology and his method of approaching and conducting appraisals—to his review of the valuation reports in this case. While Merritt could not provide opinion testimony about how the WCTL software should be adjusted because he is not familiar with the software, he does not appear to

24

propose to provide such testimony. Merritt opines that Mitchell's approach is consistent with the comp methodology and capable of producing a sound appraisal but that the PSA deviates from the industry practice. Id. at 7. That opinion reflects a reliable application of Merritt's principles and methods to the facts of this case. The defendants may question Merritt about what appraisal standards he relies on and whether he is familiar with "widely accepted standards." Dkt. No. 78- at 2. They also may cross-examine him on what he did to independently investigate the value of the plaintiffs' vehicles or to reach a conclusion about the accuracy of the reports generated in this case. Id. But the court finds the plaintiffs have demonstrated that it is more likely than not that Merritt's opinions meet the reliability requirement of Rule 702(d).

c.     Relevance

Merritt's testimony will be helpful to the trier of fact. His insights regarding the comp methodology and its application in this case will help the trier of fact assess the valuation reports and the application of the PSA. The court's decision is consistent with other courts that recently have addressed the defendants' motion to exclude Merritt's testimony. Drummond, 2023 WL 5181596, at *6; Clippinger v. State Farm Mutual Auto. Ins. Co., Case No. 20-cv-2482, 2023 WL 7213796, *5 (W.D. Tenn. Aug. 25, 2023); Volino v. Progressive Casualty Ins. Co., Case Nos. 21 Civ 6243, 22 Civ. 1714, 2023 WL 2532836, *4 (S.D.N.Y. Mar. 16, 2023) (denying defendants' motion to exclude Merritt).

25

The court will deny the defendants' motion to exclude Merritt as an expert.

## II. Conclusion

The court **GRANTS IN PART** defendants' motion to exclude the report and testimony of Kirk Felix. Dkt. No. 46. The **GRANTS** the motion to the extent that the court will not allow the plaintiffs to elicit testimony from Felix regarding Mitchell's valuation process or methodology, and will not allow the plaintiffs to rely on Felix's opinions regarding Mitchell's valuation process or technology in its briefing. The court **DENIES** the motion in all other respects.

The court **DENIES** the defendants' motion to exclude the report and testimony of Jeffrey Martin. Dkt. No. 49.

The court **DENIES** the defendants' motion to exclude the report and testimony of Jason Merritt. Dkt. No. 53.

The court **GRANTS** the defendants' unopposed motion for oral argument on class certification and summary judgment. Dkt. No. 101. The court **ORDERS** that the parties must appear for a telephonic hearing on **June 26, 2024 at 10:00 AM**. The parties must appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted.

Dated in Milwaukee, Wisconsin this 25th day of March, 2024.

BY THE COURT:

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**

26